UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PARIS MATLOCK**,                                    Case Number 1:13 CV 2250

    Plaintiff,                                        Judge Donald Nugent

    v.                                              REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.                                      Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Paris Matlock filed a Complaint (Doc. 1) against Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c).

This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1) (Non-document entry dated October 11, 2013). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL BACKGROUND

On November 23, 2010, Plaintiff filed for DIB and SSI benefits alleging disability since August 17, 2010. (Tr. 179). Plaintiff's claims were denied initially (Tr. 135-42) and on reconsideration (Tr. 145-50).  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 151).  On April 25, 2012, Plaintiff (represented by counsel), a medical expert ("ME"), and a vocational expert ("VE") testified at the hearing, after which the ALJ found Plaintiff not disabled. (Tr. 10-27; 28-82). On August 24, 2013 the Appeals Council denied

Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On October 11, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### *Plaintiff's Vocational and Personal Background*

Plaintiff was 26 years old at the time of her alleged disability onset date. (Tr. 32, 179). Plaintiff attended school through the twelfth grade and later obtained a GED. (Tr. 32-33). She took vocational courses and obtained a medical assistant certificate. (Tr. 33). Plaintiff has worked as a cleaner in a hospital, a cashier, and a State Tested Nurse Assistant ("STNA"). (Tr. 211). Plaintiff testified she last worked in 2010 as a self-employed dancer. (Tr. 33-34). Plaintiff said she was able to work as a dancer because she was self-medicating with marijuana, she mainly worked weekends, and she wouldn't go to work if she was in a depressed state. (Tr. 35, 44). She testified she had since stopped using marijuana. (Tr. 34). Plaintiff testified she quit dancing after she had a long muscle spasm in the middle of a performance. (Tr. 44-45).

Plaintiff lived with and cared for her eight-year-old daughter. (Tr. 39). Plaintiff said the child's father would come over to help with child care "every other day and every other weekend". (Tr. 39). According to Plaintiff, her typical day varied depending on whether she was in a manic phase or a depressive phase of her bipolar disorder. (Tr. 40). Plaintiff testified that on days she was depressed, she would sleep the entire day while her daughter was at school whereas on days she was manic, she would be "bouncing off the walls" and would clean and do anything to keep moving. (Tr. 40)  She said she struggled to lift items, responding that carrying a five pound bag of sugar would be "pretty heavy", that she could only carry a gallon a milk a "little

2

ways" and that she would be unable to lift and carry a twenty pound bag of potatoes. (Tr. 37). Plaintiff thought should could walk or stand for up to five minutes and sit for up to twenty minutes. (Tr. 37-38).

In a function report completed in December of 2010, Plaintiff indicated she was the sole caretaker for her child; she helped her daughter get ready for school, walked her to school, cleaned the house, and ran errands. (Tr. 230). Plaintiff said she prepared meals a few times a week, did light cleaning, laundry, and ironing, and shopped for food, clothes, and household items. (Tr. 231-32). Plaintiff reported having days she could not prepare her own meals or do anything at all due to fatigue and pain. (Tr. 231-32). Plaintiff indicated she spent time with others once or twice a week. (Tr. 233).

### *Medical Evidence*

<u>Plaintiff's Physical Impairments</u>

On February 6, 2009, Plaintiff saw Rebecca Lowenthal, M.D., at MetroHealth System ("MetroHealth") complaining of arthritis that was worse in the morning and lasted all day. (Tr. 324). Plaintiff reported Motrin and Tylenol helped "a little". (Tr. 324). Dr. Lowenthal ordered a rheumatoid factor test and an antinuclear antibodies test, instructed Plaintiff to continue taking Motrin, and encouraged Plaintiff to lose weight. (Tr. 324).

Throughout the next year and a half, Plaintiff repeatedly sought medical care both in the emergency room and during office visits for pain in various parts of her body, including her chest, which was not explained by injury. (Tr. 278, 281, 300, 316, 321, 330, 332). In each instance, diagnostic tests failed to reveal a clear cause of her pain. (Tr. 285, 302, 326, 329, 333).

On August 17, 2010, Muhammad Khan, M.D., attending physician at the Division of Rheumatology, examined Plaintiff and described multiple trigger points that were tender to palpation. (Tr. 281, 283-84). Dr. Khan diagnosed fibromyalgia and reassured Plaintiff that at that time there was no evidence of lupus, deforming arthritis, or other connective tissue disease. (Tr. 283). Dr. Khan counseled Plaintiff in fibromyalgia's benign, non-progressive nature and encouraged Plaintiff to get at least twenty minutes of low-impact, aerobic exercise a day. (Tr. 283).

Plaintiff saw Dr. Rebecca Lowenthal for fibromyalgia pain on September 13, 2010. (Tr. 273). Plaintiff was achy all over and reported exercising occasionally. (Tr. 273). Plaintiff reported trying Tylenol, Motrin, Tramadol, and "maybe Vicodin" to no avail. (Tr. 273). However, cold compresses on her knees and ankles provided temporary relief. (Tr. 273).  Dr. Lowenthal wanted to prescribe Lyrica but Plaintiff was concerned about the side effects so he prescribed Flexeril and Neutrotin. (Tr. 273).

On September 23, 2010, Plaintiff saw Julia Bruner, M.D., for a follow-up on her diffuse muscle pain, particularly in her upper hips, shoulders, and hands. (Tr. 271-72). Plaintiff did not have any stiffness or joint swelling associated with her pain. (Tr. 271). However, Plaintiff said the pain impacted her energy level and ability to keep working. (Tr. 271). Plaintiff said she had not tried Neutrotin as prescribed because she was concerned about taking too much medication. (Tr. 271). Plaintiff tried walking and experienced increased pain rather than improvement. (Tr. 271). Plaintiff was not stretching when she exercised. (Tr. 271). Dr. Bruner encouraged Plaintiff to make lifestyle changes to aide her symptoms, prescribed a trial of Amitryptiline and recommended Plaintiff be evaluated with behavioral health. (Tr. 272).

4

On February 17, 2011, Plaintiff saw Amy M. Zack, M.D., at MetroHealth complaining of pain in her neck and back, muscle cramps in her calves at night, and sore legs in the morning. (Tr. 389). Plaintiff reported she had been unable to take Lyrica because of the side effects. (Tr. 389). At Plaintiff's request, Dr. Zack tested for Lyme disease because of Plaintiff's recent travel to North Carolina. (Tr. 389). On examination, Plaintiff had no edema, but had spasms in her neck and mid-back and an abnormal gait. (Tr. 389). Dr. Zack ordered blood tests, prescribed vitamins, Lyme Disease antibodies, and Zantac for gastroesophageal reflux disease (GERD), and referred Plaintiff to an arthritis clinic for fibromyalgia. (Tr. 390).

Plaintiff went to the emergency room on March 4, 2011 complaining of right foot pain and swelling that radiated up her leg for three days. (Tr. 375).  On examination, Plaintiff's right lower extremity showed no deformity, erythema, ecchymosis, or edema. (Tr. 377). Plaintiff's right foot was neurovascularly intact with normal pulses and sensation, but she was tender to palpation in her posterior calf and ankle/foot and there was mild swelling from her right knee to her toes. (Tr. 377). Plaintiff was diagnosed with peripheral edema of the right lower extremity and was advised to elevate and rest her foot and take pain relievers. (Tr. 377).

On April 14, 2011, Plaintiff saw Dr. Zack complaining of pain in all of her toes, muscles, and joints and swelling in her feet. (Tr. 369). On examination, Plaintiff had mild, non-pitting edema over the dorsum of her bilateral feet. (Tr. 370). Dr. Zack ordered an arthritis service request and x-rays of both feet. (Tr. 370). Plaintiff had x-rays taken on April 25, 2011, which were normal. (Tr. 395-97).

Plaintiff saw Dr. Khan on May 13, 2011, for diffuse aches and pains with muscle cramps. (Tr. 359). On examination, Plaintiff had a full range of motion in all joints but had multiple

5

tender points typical of fibromyalgia. (Tr. 361). Plaintiff had no sensory deficit or muscle weakness. (Tr. 361). Dr. Khan diagnosed vitamin D deficiency and advised Plaintiff to take vitamins. (Tr. 362). Dr. Khan recommended aerobic exercise to address Plaintiff's fibromyalgia pain. (Tr. 362).

Plaintiff's Mental Impairments

In 2003 Plaintiff was admitted to University Hospitals of Cleveland after she was brought in by EMS for abdominal pain and said she took two Wellbutrin because she was feeling depressed.[1] (Tr. 490). Plaintiff was diagnosed with major depressive disorder and hospital records noted Plaintiff had seen a therapist who diagnosed bipolar disorder. (Tr. 486-91). Plaintiff returned to University Hospitals in June 2004 with suicidal thoughts and concern she may harm herself. (Tr. 484-85).

Plaintiff's next mental-health centered visit occurred on October 20, 2010 when Plaintiff saw Howard Hernandez, M.D., for a mental health assessment. (Tr. 265). Plaintiff's chief complaint was depression. (Tr. 365). She reported experiencing loss of interest, low concentration, irritability, trouble sleeping, racing thoughts, hypersexuality, and going on shopping sprees to the point of having to cut her line of credit. (Tr. 266). Plaintiff also reported visualizing hitting her ex-husband due to anger over things he had done in the past. (Tr. 266). Plaintiff admitted to daily THC use. (Tr. 266). Plaintiff gave a history of depression, postpartum depression, bipolar disorder, Post-Traumatic Stress Disorder ("PTSD"), and fibromyalgia. (Tr. 265). Plaintiff also reported a history of childhood molestation by two cousins and her brother's father whom Plaintiff suspects may have murdered her mother. (Tr. 268). On examination, Plaintiff was well-groomed, cooperative and oriented to time, person, and place. (Tr. 268).

---

1. The record does not indicate taking Wellbutrin caused Plaintiff's abdominal pain.

Plaintiff's speech was clear, her thought process was logical with tight associations, and she had fair judgment and insight. (Tr. 268). Plaintiff had good recent and remote memory recall and her attention and concentration were sustained. (Tr. 268). Plaintiff's mood was depressed and irritable. (Tr. 268). Plaintiff denied auditory hallucinations, visual hallucinations, or suicidal or homicidal thoughts or intentions. (Tr. 268). Dr. Hernandez diagnosed unspecified mood disorder and prescribed Cymbalta and Tradazone for sleep, continued Plaintiff on Elavil, and recommended continued counseling. (Tr. 269).

Plaintiff saw Dr. Hernandez two more times for pharmacological management on November 16, 2010 and December 14, 2010. (Tr. 257, 262).  Her mental status examinations remained largely unchanged from her first appointment. (Tr. 257-58, 262-64). She continued to report problems with irritability, anxiety, feeling hyper, and pain management. (Tr. 257-58, 262-63).

Plaintiff saw Smitha Battula, M.D., for pharmacological management on February 23, 2011. (Tr. 385). Plaintiff felt worse in terms of bodily pain and her mood was irritable. (Tr. 385). Plaintiff said she had racing thoughts and went a week without sleeping. (Tr. 385). Plaintiff said she had spending and cleaning sprees, experienced panic attacks, and felt paranoid with no delusions. (Tr. 385). On examination, Plaintiff was adequately groomed but appeared sad and down. (Tr. 386). Plaintiff was cooperative, oriented to time, place, and person, and displayed spontaneous speech with normal rate and flow. Her thought process was logical, her recent and remote memory were within normal limits, and she had fair judgment and insight. (Tr. 386). Plaintiff's mood was irritable, her affect constricted, and her attention and concentration

distracted. (Tr. 386). Dr. Battula diagnosed bipolar disorder, panic disorder with agoraphobia, and PTSD. (Tr. 386). Dr. Battula prescribed Pristiq, Depakote, and Klonopin. (Tr. 386).

Plaintiff returned to Dr. Battula for pharmacological management on May 12, 2011. (Tr. 354). Plaintiff said her mood was irritable and "snappy." (Tr. 354). Plaintiff reported having a poor appetite and trouble sleeping due to racing thoughts and nightmares. (Tr. 354). She had a recent hypomanic episode where she was unable to sleep for three days with high energy and racing thoughts. (Tr. 354).  Plaintiff reported hearing voices, whispers, and a baby crying two or three times per week. (Tr. 354). Plaintiff also reported seeing shadows occasionally. (Tr. 355). Plaintiff felt paranoid and experienced panic attacks, fear of going into crowded spaces, and flashbacks of her childhood sexual abuse. (Tr. 254-55). On examination, Plaintiff appeared adequately groomed but hypomanic and irritable. (Tr. 355). Plaintiff's behavior was cooperative, her thought process was logical with no evidence of paranoia, and she was oriented to time, place, and person. (Tr. 355). Plaintiff's speech was rapid but interruptible and her attention and concentration were distracted. (Tr. 355). Plaintiff's recent and remote memory were normal and her judgment and insight were fair. (Tr. 355). Dr. Battula diagnosed THC abuse/dependence in addition to her prior diagnoses. (Tr. 355). Dr. Battula continued Plaintiff on Pristiq, Klonopin, and Trazodone, discontinued Depakote (because it was stopped by the patient), and started Seroquel XR. (Tr. 356).

Plaintiff saw Rebecca Snider-Fuller, P.C.N.S., for pharmacological management on October 12, 2011. (Tr. 464). Plaintiff reported increased fibromyalgia pain due to rainy weather. (Tr. 464). Plaintiff said she did stretches but was careful not to over-do it. (Tr. 464). Plaintiff reported not drinking since her last visit and that she was cutting back on her marijuana use. (Tr.

464). Nurse Snider-Fuller concluded Plaintiff was stable, prescribed Abilify, and discontinued Seroquel. (Tr. 465).

On October 20, 2011, Plaintiff saw Kristen L. Liviskie, L.L.S.W., for a behavioral health counseling appointment. (Tr. 460). Plaintiff said she worried about her eight-year-old daughter being molested and reported feeling guilt over her own molestation. (Tr. 460-61). Plaintiff identified her husband as the source of her frustration, specifically stating she was bothered by her husband's relationship with her daughter which she felt was more like a brother and sister than a father and child. (Tr. 461). Plaintiff reported they had been separated for three years but their communication had improved. (Tr. 461). Plaintiff's mental status examination was largely unremarkable. (Tr. 461).

On November 23, 2011, Plaintiff saw Nurse Snider-Fuller and reported being exhausted and stressed. (Tr. 457). Plaintiff described marital problems as well as problems with her cousin. (Tr. 457). Plaintiff indicated she was snappy, irritable, and had one-to-two panic attacks per day but her flashbacks were not as bad. (Tr. 457). On examination, Plaintiff was cooperative but agitated and anxious. (Tr. 457).  Plaintiff's speech remained normal and spontaneous, she was oriented, and her judgment and insight were fair. (Tr. 457). She had a logical thought process but suffered from racing, paranoid thoughts. (Tr. 457). Plaintiff continued to suffer from auditory and visual hallucinations as well as worsening memory. (Tr. 457). Nurse Snider-Fuller restarted Abilify, continued Klonopin, encouraged Plaintiff to remain sober, and questioned her compliance with medications. (Tr. 458).

Plaintiff saw Ms. Liviskie two more times for individualized counseling on November 28 and December 13, 2011 and saw Nurse Snider-Fuller one more time for pharmacological

management on December 28, 2011. (Tr. 446, 450, 453). During these appointments, Plaintiff continued to describe marriage-related stress exacerbated by the PTSD her husband developed while serving in Iraq. (Tr. 446, 450). On examination, Plaintiff was repeatedly well-groomed with good hygiene, cooperative, oriented to time, place, and person, had good insight, judgment, and organized thoughts, and displayed spontaneous speech with normal rate and flow. (Tr. 446, 450). Plaintiff's mood was consistently anxious and irritable. (Tr. 446, 451). On December 11, Ms. Liviskie noted Plaintiff's concentration was sustained, but on December 28, Nurse Snider-Fuller found Plaintiff's attention and concentration was poor. (Tr. 446, 450).

In a letter dated January 23, 2012 Ms. Liviskie and Nurse Snider-Fuller, reported Plaintiff had been receiving medication management services from Nurse Snider-Fuller since August 1, 2011 and behavioral health counseling from Ms. Liviskie since September 6, 2011 for bipolar disorder and posttraumatic stress disorder. (Tr. 423). This letter was meant to supplement medical records not admitted to evidence until after the hearing on February 3, 2012. (Tr. 21, 425-468). Ms. Liviskie and Nurse Snider-Fuller noted Plaintiff had experienced several traumatic events in her life and had difficulties in her day-to-day functioning. (Tr. 423). They said it was difficult for Plaintiff to be around people due to anxiety and described Plaintiff's symptoms as alternating between depression and hypomania. (Tr. 423). Although Plaintiff was working towards stabilizing her symptoms, they were exacerbated by her fibromyalgia. (Tr. 423).

On June 3, 2013, Plaintiff was seen at St. Vincent's emergency room complaining of depression and suicidal and homicidal ideation. (Tr. 500). On examination, Plaintiff appeared well and alert and her mood was normal although on psychological assessment, some anger was

detected. (Tr. 500-501, 503). The treating physician assessed Plaintiff as a low suicide risk. (Tr. 505). Plaintiff was diagnosed with generalized anxiety disorder and PTSD and assessed a global assessment of function ("GAF") score of 60.[2] (Tr. 506). At discharge, the treating physician made arrangements for crisis stabilization and prescribed Trazodone, Klonopin, and Risperdol. (Tr. 506-508).

Psychological Questionnaire

On June 23, 2011, Dr. Battula completed a psychological questionnaire. (Tr. 402-403). Dr. Battula stated Plaintiff was initially examined at MetroHealth on October 20, 2010 and had been seen every one-to-two months since for bipolar disorder. (Tr. 402). Dr. Battula diagnosed bipolar disorder, panic disorder with agoraphobia, PTSD, and marijuana abuse. (Tr. 402). He stated that Plaintiff's symptoms when depressed included depression, irritable mood, poor appetite, low energy, anhedonia, and poor sleep; and stated that her symptoms when hypomanic included racing thoughts, not sleeping for days, spending and cleaning sprees, auditory hallucinations, and recurrent nightmares. (Tr. 402). When asked about Plaintiff's ability to sustain an eight-hour work day, five days a week, Dr. Battula said Plaintiff would have difficulty with attention and concentration that interferes with her daily functioning. (Tr. 402). Dr. Battula said Plaintiff's bipolar disorder caused her to be irritable and snappy and that Plaintiff had panic attacks in crowded places that would affect her ability to get along with co-workers, supervisors, and the general public. (Tr. 403). Dr. Battula said Plaintiff would have difficulty in public places and difficulty concentrating that would affect her ability to respond to work pressures including

_____

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A higher number represents a higher level of functioning. *Id.* A GAF score of 51–60 reflects moderate symptoms (e.g., flat effect and circumstantial speech) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV-TR,* at 34.

decision making, attendance, and maintaining a schedule. (Tr. 403). When asked for additional comments on Plaintiff's capabilities for working in a competitive work environment on a regular, sustained basis, Dr. Battula said Plaintiff had poor sleep due to bipolar disorder, PTSD caused auditory hallucinations, and Plaintiff had difficulty with organization and concentration. (Tr. 403).

Consultative Examinations

On February 18, 2011, David House, Ph.D., conducted a consultative psychological evaluation of Plaintiff. (Tr. 337). Plaintiff's grooming and hygiene appeared adequate, she ambulated with especial difficulty, and her mood was blunted. (Tr. 339). Plaintiff's speech was understandable without poverty of content, loose associations, or tangential speech and her eye contact was fair. (Tr. 339). Plaintiff elicited no delusional material during the interview, did not present as paranoid or grandiose, and denied any auditory or visual hallucinations. (Tr. 340). On examination, Plaintiff was oriented to place, person, and partially to time. (Tr. 340). Plaintiff's memory for digits and computational skills were borderline but her knowledge of current events was fair. (Tr. 341). Plaintiff's insight and judgment were markedly limited and Dr. House opined that Plaintiff would need supervision in management of her finances and daily affairs. (Tr. 341). Dr. House diagnosed panic disorder without agoraphobia, bereavement, and cannabis abuse. (Tr. 341). He opined that Plaintiff's anxiety caused her to be markedly limited in her ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks. (Tr. 341). Plaintiff's ability to understand, remember, and follow directions was no worse than mildly limited, her level of adaptability was moderately limited, as was her ability to relate to others and the general public. (Tr. 341-42). Dr. House opined that Plaintiff's ability to withstand the stress

12

and pressure of day-to-day work was markedly limited, primarily due to anxiety. (Tr. 341). Dr. House assigned a GAF score of 43[3] based on Plaintiff's panic attacks and opined that functionally, Plaintiff appeared to demonstrate serious impairment in employability. (Tr. 342).

On March 15, 2011, Mehdi Saghafi, M.D., conducted a consultative physical evaluation of Plaintiff. (Tr. 343, 346). On examination, Plaintiff's back revealed no gross deformity and no muscle spasms. (Tr. 345). Plaintiff's straight leg raise testing revealed some limitation due to pain in her hips and the back of her legs. (Tr. 345). Based on her history and objective physical findings, Dr. Saghafi found Plaintiff could stand and walk for four-to-five hours a day, did not need ambulatory aid, and could lift and carry five pounds frequently and fifteen pounds occasionally. (Tr. 346). Plaintiff could push and pull objects, operate hand and foot controlled devises, and was able to drive a vehicle despite not having a license due to her medical issues. (Tr. 346). Plaintiff's speech, hearing, memory, orientation, and attention were within normal limits. (Tr. 346).

Medical Expert Testimony

At the request of the ALJ, ME Daniel Schweid, M.D., testified at the hearing. (Tr. 45). Dr. Schweid testified that Plaintiff had bipolar disorder, panic disorder with some agoraphobia, PTSD, fibromyalgia, and cannabis abuse. (Tr. 53-54).  Dr. Schweid testified that Plaintiff was moderately impaired in her abilities to complete activities of daily living and maintain social functioning, concentration, persistence, and pace. (Tr. 55). Dr. Schweid testified that, in his opinion, Plaintiff's impairments did not meet or equal a listed impairment. (Tr. 55-56).

---

3. *See* DSM-IV-TR, *supra*, note 2. A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)" *Id.* at 34.

With regard to Plaintiff's residual functional capacity ("RFC"), Dr. Schweid said he would limit Plaintiff to a range of light work. (Tr. 56). Due to marijuana use and fibromyalgia, Plaintiff should not be around unprotected heights, dangerous machinery, or drive a motor vehicle. (Tr. 56). Plaintiff was limited to simple, repetitive tasks that did not have high or strict production quotas or involve intense interpersonal aspects such as arbitration, negotiation, confrontation, being a supervisor or manager or otherwise being responsible for other people. (Tr. 56-57). Dr. Schweid said Plaintiff's substance abuse made the question of sustainability "very tough". Dr. Schweid opined that Plaintiff could not sustain substantial gainful activity. (Tr. 57). After a lengthy discussion regarding Plaintiff's marijuana use, Dr. Schweid testified that he could only say that he would advise people clinically to stop using and that he could not say for certain marijuana's impact on Plaintiff's symptoms. (Tr. 59-60). However, Dr. Schweid opined that even if Plaintiff stopped using marijuana, she would still be absent from work three-to-four times a month due to fibromyalgia and mood problems. (Tr. 61).

VE Testimony

Mark Anderson, VE also testified at the hearing. (Tr. 66). The ALJ asked the VE about a hypothetical person with Plaintiff's vocational background who was limited to sedentary or light work; could not climb ladders, ropes, or scaffolds; was limited to routine, low stress tasks with no assembly line work, no high or strict production quotas, or piece rate work; and required work that didn't involve negotiation, confrontation, or other intense interpersonal interaction with co-workers, supervisors, or the general public or managing or being responsible for other people. (Tr. 71). The VE responded that such an individual would be unable to perform Plaintiff's past relevant work. (Tr. 71). He said such a person could perform jobs available in the national

14

economy including inspector and hand packager, housekeeper, and mail clerk. (Tr. 72). The ALJ then asked about a second hypothetical individual, who had all of the restrictions of the person in the first hypothetical but who also could not work in proximity to unprotected heights, dangerous moving machinery, or other workplace hazards, or operate a motor vehicle as part of the job. (Tr. 73). The VE responded that such a person would still be able to perform those three jobs. (Tr. 73). The ALJ then asked about a hypothetical person with Plaintiff's vocational background who was limited to sedentary work. (Tr. 73). The VE identified document preparer, patcher, and touch-up screener as jobs such a person could perform. (Tr. 74). The ALJ then added the restrictions of not being able to work in proximity to unprotected heights, dangerous moving machinery, or other workplace hazards, or operate a motor vehicle as part of the job. (Tr. 75). The VE responded that Plaintiff could still perform those three jobs. (Tr. 75). The ALJ then asked whether the answers to any of these hypotheticals would change if the individual were absent, on average, one day per week. (Tr. 75).  The VE responded that there were not a significant number of jobs in the national economy that would tolerate one absence per week. (Tr. 75-76).

### ALJ's Decision

On May 25, 2012, the ALJ found Plaintiff had the severe impairments of fibromyalgia, bipolar disorder, panic disorder with some agoraphobia, PTSD, and marijuana abuse. (Tr. 15). The ALJ found Plaintiff's impairments considered singly and in combination did not meet or equal a listing. (Tr. 16). The ALJ found Plaintiff had a moderate restriction in activities of daily living based on a function report completed by Plaintiff. (Tr. 17). The ALJ found Plaintiff had moderate difficulties in terms of social functioning based on Plaintiff's account of her social

activities in the report and to doctors. (Tr. 17). Further, the ALJ found Plaintiff had moderate difficulties with regard to concentration, persistence, or pace. (Tr. 17). In making this finding, the ALJ disagreed with Dr. House, who found Plaintiff to be markedly impaired in this area, noting that Dr. House's opinion was an overestimate of the severity of Plaintiff's restrictions, and was based only on a snapshot of her functioning and that he agreed with the state agency consultant who noted Plaintiff was functional on a daily basis. (Tr. 17).

Next, the ALJ found Plaintiff had the RFC to do work at the sedentary level. (Tr. 18). Additionally, Plaintiff could not climb ladders, ropes, or scaffolds; could not work in proximity to unprotected heights, dangerous machinery, or other workplace hazards; could not operate a motor vehicle; and could do only routine, low stress tasks with no high or fixed production quotas, assembly line work, or work involving intense interpersonal interactions with the public, co-workers, or supervisors. (Tr. 18). Further, Plaintiff could not manage or supervise others and could not be responsible for their health, safety, or welfare. (Tr. 18). Based on Plaintiff's age, education, work experience, RFC, and VE and ME testimony the ALJ found Plaintiff could work as document preparer, patcher, or touch-up screener. (Tr. 23). Thus, the ALJ found Plaintiff was not disabled. (Tr. 23-24).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

16

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

17

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff asserts the ALJ erred by failing to: 1) consider the opinion of Plaintiff's treating psychologist Dr. Battula; 2) adequately evaluate the opinion of examining psychologist Dr. House; and 3) adequately evaluate the opinion of the medical expert Dr. Schweid. (Doc. 14, at 14-16). Plaintiff asserts that because of these errors, the ALJ's evaluation of Plaintiff's RFC is not supported by substantial evidence. Each of these arguments will be addressed in turn.

### Dr. Battula

Plaintiff argues the ALJ erred by failing to consider the medical opinion of Plaintiff's treating psychiatrist Dr. Battula, who completed a psychological questionnaire for Plaintiff on June 23, 2011. (Doc. 14, at 15; Tr. 402-403). Defendant argues the ALJ was not required to evaluate the psychological questionnaire because it is not a medical opinion. While the Court finds the psychological questionnaire is a medical opinion, because the ALJ complied with the well-known treating physician rule, Plaintiff's argument is not well-taken.

"Medical opinion" is defined under the regulations as "statements from physicians and

18

psychologists or other acceptable medical sources that reflect judgment about the nature and severity of [claimant's] impairment(s), including [her] symptoms and prognosis, what [she] can still do despite impairment(s), and [her] physical or mental restrictions." 20 C.F.R. § 404.1527 (a)(2).

The psychological questionnaire completed by Dr. Battula contained Plaintiff's diagnoses and symptoms. (Tr. 402). Further, it contained statements that reflect judgment on the nature and severity of Plaintiff's impairments. Dr. Battula averred that Plaintiff's medications caused drowsiness and somnolence that would affect Plaintiff's ability to work. (Tr. 402). He further opined that Plaintiff would get irritable and snappy due to her bipolar disorder and that this along with Plaintiff's panic disorder, which caused her to have panic attacks in crowded places, would affect her ability to get along with co-workers, supervisors, and the general public. (Tr. 403). He also stated that Plaintiff's difficulty in public places and with concentration would impact her ability to respond appropriately to workplace pressures including decision making, attendance, and maintaining a schedule and that her poor sleep, auditory hallucinations, and difficulty with organization and concentration would impact her ability to sustain work in a competitive environment. (Tr. 403). Further, Dr. Battula opined that Plaintiff's symptoms interfere with her daily ability to function. (Tr. 403).  Therefore, by commenting on Plaintiff's symptoms, diagnoses, and functional abilities, the psychological questionnaire constitutes a medical opinion under the regulations. 20 C.F.R. § 404.1527(a)(2).

Since the questionnaire is a medical opinion, this Court must now consider whether the ALJ gave the opinion proper weight. Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*,

486 F.3d 234, 242 (6th Cir. 2007). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id*. When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id*.

Importantly, the ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id*. "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (*quoting* SSR 96-2p, 1996 WL 374188, at *4). An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F. 3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409-10 (6th Cir. 2009).

Neither party disputes that Dr. Battula, who saw Plaintiff on at least two occasions as part of her care at MetroHealth, qualified as a treating physician. (Tr. 354, 385).  In his opinion, the ALJ did not expressly assign weight to Dr. Battula's opinion in calculating Plaintiff's RFC. (Tr. 10-24). Rather, the ALJ's opinion stated, "Dr. Battula has treated the claimant at the MetroHealth Broadway Health Center. He reported the claimant's diagnoses include bipolar disorder, panic disorder with agoraphobia, post-traumatic stress disorder and marijuana abuse.

He also said the claimant had some auditory hallucinations." (Tr. 16). Beyond this, the ALJ referenced Dr. Battula's opinion in his analysis, to discredit Dr. House's opinion that Plaintiff was markedly limited in her ability to maintain concentration, persistence, and pace stating, "Claimant's treating Battula [sic] said claimant would have difficulty concentrating and paying attention with her current medical condition. He does not say how great the difficulty would be". (Tr. 17). This shows less than full weight was given to Dr. Battula's opinion because the doctor did not supply enough information for his opinion to be valid. This is a good reason for affording limited weight to a treating physician's opinion. Therefore, the ALJ complied with the treating physician rule. *See*, *Francis v. Comm'r of Soc. Sec. Adm.*, 414 F. App'x 802, 804-06 (6th Cir., 2011) (Noting the "good reasons" rule does not require an "exhaustive factor-by-factor analysis").

However, even if the ALJ's opinion did not make the weight and underlying good reasons sufficiently clear, the Sixth Circuit recognizes an exception under the harmless error doctrine. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 750 (6th Cir. 2007); *see also Blakely*, 581 F.3d 399 (holding failure to give good reasons for assigned weight requires remand barring harmless error). Harmless error can occur in three instances: 1) if a "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; 2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion"; or 3) "where the Commissioner has met the goal of [§§ 404.1527(d)(2) 416.927(d)(2)] - the provision of the procedural safeguard of reasons - even though [he] has not complied with the terms of the regulation." *Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (citing *Wilson*, 378 F.3d at 547).

While the psychological questionnaire is a medical opinion, it provided the ALJ with extremely limited information that would assist him in determining whether the Plaintiff is disabled. The opinion merely provided information that was available in the other medical records, such as Plaintiff's diagnosis and symptoms. (Tr. 402). All that the ALJ could surmise from Dr. Battula's answers on the questionnaire is that virtually all Plaintiff's symptoms would continue to affect her throughout the workday. (Tr. 402-403). The questionnaire further provided her conditions would interfere with her work day on a daily basis. (Tr. 403). Beyond this, there was no information about the extent to which these conditions interfere with Plaintiff working and hence there was nothing in the questionnaire that would assist the ALJ in completing his analysis. (Tr. 402-403).

The ALJ did not ignore Dr. Battula's opinion in its entirety, rather he summarized the opinion (Tr. 16), and indicated that he could not adequately use it to determine the severity of Plaintiff's symptoms because the opinion did not provide any information in this regard (Tr. 17). While the regulations generally require the ALJ give an explicit indication of the weight given to a treating physician's opinion *Nelson* 195 F. App'x at 470, the ALJ made clear his reasons for affording less than full weight to the opinion thereby meeting the goal of the procedural safeguards provided in the regulations.

Further, the ALJ accounted for the symptoms stated in the questionnaire in determining Plaintiff's RFC was limited to low stress work without intense interpersonal interactions or managing or being responsible for their welfare. (Tr. 18). Since Dr. Battula did not provide any information on the severity of symptoms, his RFC which accounted for them essentially adopted

Dr. Battula's opinion thereby meeting the requirements of the second instance where a harmless error finding is appropriate.

In sum, this is a clear case of harmless error because although the ALJ did not explicitly provide the weight assigned to Dr. Battula's opinion as required by the regulations, he did clearly indicate why the opinion did not contribute anything to his analysis thereby providing his good reason for discounting the opinion and meeting the goal of the procedural safeguards required in the regulations. Further, since all the opinion provides is symptoms and the acknowledgement that those symptoms would impact Plaintiff throughout the workday; the ALJ has made findings consistent with Dr. Battula's opinion because he considered accommodating all these symptoms in making his RFC finding. Therefore, the ALJ's failure to assign weight to Dr. Battula's opinion was harmless.

### Dr. House

Plaintiff further argues the ALJ erred by failing to adequately evaluate the opinion of examining psychologist Dr. House. This assignment of error is not well-taken.

Non-treating sources are physicians, psychologists, or other acceptable medical sources who have examined the claimant but do not have, or did not have, an ongoing treatment relationship with them. 20 C.F.R. §§ 404.1502, 416.927. This includes a consultative examiner. *Id.* When determining what weight to give examining sources the same factors that are considered for treating physicians must be considered including the supportability of the opinion and the consistency of the opinion with the record as a whole. *Id.*

The ALJ evaluated Dr. House's opinion as follows:

With regard to concentration, persistence or pace, the claimant has moderate difficulties. The claimant reported she can count change, handle a savings account and use a checkbook/money orders (Exhibit 5E/5). Consultative examiner House

said she has a "marked" limit in this area and gave a Global Assessment of
Functioning of 43 (Exhibit 2F, 2/18/11). I agree with State agency consultant who
noted the claimant was functional on a daily basis (Exhibit 1A/7) and the note that
Dr. House's opinion is an overestimate of the severity of the claimant's
restrictions and is based only on a snap shot of the individual's functioning
(Exhibit 5A/10). Claimant's treating Battula [sic] said claimant would have
difficulty concentrating and paying attention with her current mental condition.
He did not say how great the difficulty would be. Dr. Schweid testified the
claimant is moderately limited in this area. The claimant's concentration was
sustained when she was seen at MetroHealth Broadway Health Center (Exhibit
1F/3; 13/ 8F/37).

(Tr. 17).

Here, the ALJ found that Dr. House's opinion that Plaintiff's attention and concentration
ability was markedly impaired should be afforded limited weight because of a lack of
consistency with the record as a whole, noting that Plaintiff had the ability to count change, use a
check book/money orders, and that when Plaintiff was seen for psychiatric care by other medical
professionals, her attention and concentration were frequently found to be within the normal
range. (Tr. 17, 233, 258, 263, 268, 450).  The ALJ further noted that Dr. House's opinion was
not supported by multiple other non-examining sources and that Dr. House's opinion was only a
snapshot of Plaintiff's mental state not supported by additional information. (Tr. 17, 55, 89).  In
other words, the ALJ commented on the consistency with the record and his conclusion is
supported by substantial evidence. Therefore the ALJ's decision to afford limited weight to Dr.
House's opinion is supported by the requisite good reasons.

***Dr. Schweid***

Plaintiff next argues the ALJ erred in his evaluation of the ME, Dr. Schweid. (Doc. 14, at
16). Specifically, Plaintiff argues the ALJ erred in stating that Dr. Schweid's testimony that

Plaintiff was unable to sustain substantial gainful activity is not supported by substantial evidence. (Doc. 14, at 16).

Last in the medical source hierarchy are non-examining sources. These are physicians, psychologists, or other acceptable medical sources who have not examined the claimant, but review medical evidence and provide an opinion. 20 C.F.R. §§ 404.1502, 416.927. This includes state agency physicians and psychologists. *Id.* Medical experts who testify at trial but have not examined the claimant are also evaluated under these factors. 20 C.F.R. § 404.1527g(2)(iii).  The ALJ "must consider findings and other opinions of [s]tate agency medical and psychological consultants . . . as opinion evidence", except for the ultimate determination about whether the individual is disabled. 20 C.F.R. § 404.1527(e)(2)(ii). The findings of non-examining sources are evaluated using the same criteria as all other medical opinions. 20 C.F.R. §§ 404.1527(e), 416.927(e)

Here, the ALJ highlighted how Dr. Schweid's opinion that Plaintiff could not sustain gainful activity was not supported by his assessment that Plaintiff was only moderately limited in her ability to perform activities of daily living, function socially, and concentrate. (Tr. 21). The ALJ reasoned Dr. Schweid's testimony was not well supported because he based it on testimony that he himself acknowledged lacks credibility. (Tr. 21, 58). The ALJ further noted Dr. Schweid himself said he had difficulty determining the severity of Plaintiff's impairments due to the lack of treating notes. (Tr. 21, 55).  These statements challenge the supportability of the opinion.

Additionally, the ALJ reasoned Dr. Schweid's opinion was not consistent with the record as a whole. The ALJ addressed the treating notes of Ms. Liviskie and Nurse Snider-Fuller which were submitted after the hearing and stated that while they acknowledged Plaintiff had some

problems, her concentration was usually sustained suggesting that she could sustain gainful activity. (Tr. 22, 425-68). However, Plaintiff argues these records support rather than detract from the ALJ's opinion. (Doc. 14, at 16).

While Plaintiff correctly states that these records indicate at times she experienced paranoid thoughts, auditory and visual hallucinations, and her attention and concentration were impaired (Tr. 446, 457), the records also show Plaintiff had sustained concentration at times, frequently had fair judgment and insight, and that Ms. Liviskie and Nurse Snider-Fuller assessed Plaintiff's status to be stabilizing or stable depending upon the appointment. (Tr. 446, 450, 454, 457, 465). These records do not provide any information, such as the opinion of another health care provider, which clearly indicates that Plaintiff would be unable to sustain gainful employment. Further, the ALJ correctly acknowledged Dr. Schweid's opinion that Plaintiff was not capable of sustaining gainful activity was not based upon these records because the records were not available at the time of the hearing. (Tr. 21-22). The ALJ assessed Dr. Schweid's opinion based on how it was formed and its consistency with the record.  Therefore, the ALJ's decision provided good reasons to afford limited weight to Dr. Schweid's opinion.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI benefits applied the correct legal standards and is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge

26

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).