IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| PARIS MATLOCK, | ) | CASE NO. 1:13 CV 2250 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | | Magistrate Judge James R. Knepp II |
| | ) | |
| Defendant. | ) | **MEMORANDUM OPINION** |

This matter is before the Court on the Report and Recommendation of Magistrate Judge James R. Knepp II (Docket #16), recommending that the Commissioner of Social Security's final determination denying Plaintiff, Paris Matlock's application for Disability Insurance Benefits and Supplemental Security Income be affirmed.

**Factual and Procedural Background**

As set forth by the Magistrate Judge, the factual and procedural history of this case is as follows:

**PROCEDURAL BACKGROUND**

On November 23, 2010, Plaintiff filed for DIB and SSI benefits alleging disability since August 17, 2010. (Tr. 179). Plaintiff's claims were denied initially (Tr. 135-42) and on reconsideration (Tr. 145-50). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 151). On April 25, 2012, Plaintiff (represented by counsel), a medical expert ("ME"), and a vocational expert ("VE") testified at the hearing, after which the ALJ found

Plaintiff not disabled. (Tr. 10-27; 28-82). On August 24, 2013 the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. On October 11, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

*Plaintiff's Vocational and Personal Background*

Plaintiff was 26 years old at the time of her alleged disability onset date. (Tr. 32, 179). Plaintiff attended school through the twelfth grade and later obtained a GED. (Tr. 32-33). She took vocational courses and obtained a medical assistant certificate. (Tr. 33). Plaintiff has worked as a cleaner in a hospital, a cashier, and a State Tested Nurse Assistant ("STNA"). (Tr. 211). Plaintiff testified she last worked in 2010 as a self-employed dancer. (Tr. 33-34). Plaintiff said she was able to work as a dancer because she was self-medicating with marijuana, she mainly worked weekends, and she wouldn't go to work if she was in a depressed state. (Tr. 35, 44). She testified she had since stopped using marijuana. (Tr. 34). Plaintiff testified she quit dancing after she had a long muscle spasm in the middle of a performance. (Tr. 44-45).

Plaintiff lived with and cared for her eight-year-old daughter. (Tr. 39). Plaintiff said the child's father would come over to help with child care "every other day and every other weekend". (Tr. 39). According to Plaintiff, her typical day varied depending on whether she was in a manic phase or a depressive phase of her bipolar disorder. (Tr. 40). Plaintiff testified that on days she was depressed, she would sleep the entire day while her daughter was at school whereas on days she was manic, she would be "bouncing off the walls" and would clean and do anything to keep moving. (Tr. 40) She said she struggled to lift items, responding that carrying a five pound bag of sugar would be "pretty heavy", that she could only carry a gallon a milk a "little ways" and that she would be unable to lift and carry a twenty pound bag of potatoes. (Tr. 37). Plaintiff thought should could walk or stand for up to five minutes and sit for up to twenty minutes. (Tr. 37-38).

In a function report completed in December of 2010, Plaintiff indicated she was the sole caretaker for her child; she helped her daughter get ready for school, walked her to school, cleaned the house, and ran errands. (Tr. 230). Plaintiff said she prepared meals a few times a week, did light cleaning, laundry, and ironing, and shopped for food, clothes, and household items. (Tr. 231-32). Plaintiff reported having days she could not prepare her own meals or do anything at all due to fatigue and pain. (Tr. 231-32). Plaintiff indicated she spent time with others once or twice a week. (Tr. 233).
*Medical Evidence*

-2-

<u>Plaintiff's Physical Impairments</u>

On February 6, 2009, Plaintiff saw Rebecca Lowenthal, M.D., at MetroHealth System ("MetroHealth") complaining of arthritis that was worse in the morning and lasted all day. (Tr. 324). Plaintiff reported Motrin and Tylenol helped "a little". (Tr. 324). Dr. Lowenthal ordered a rheumatoid factor test and an antinuclear antibodies test, instructed Plaintiff to continue taking Motrin, and encouraged Plaintiff to lose weight. (Tr. 324).

Throughout the next year and a half, Plaintiff repeatedly sought medical care both in the emergency room and during office visits for pain in various parts of her body, including her chest, which was not explained by injury. (Tr. 278, 281, 300, 316, 321, 330, 332). In each instance, diagnostic tests failed to reveal a clear cause of her pain. (Tr. 285, 302, 326, 329, 333).

On August 17, 2010, Muhammad Khan, M.D., attending physician at the Division of Rheumatology, examined Plaintiff and described multiple trigger points that were tender to palpation. (Tr. 281, 283-84). Dr. Khan diagnosed fibromyalgia and reassured Plaintiff that at that time there was no evidence of lupus, deforming arthritis, or other connective tissue disease. (Tr. 283). Dr. Khan counseled Plaintiff in fibromyalgia's benign, non-progressive nature and encouraged Plaintiff to get at least twenty minutes of low-impact, aerobic exercise a day. (Tr. 283).

Plaintiff saw Dr. Rebecca Lowenthal for fibromyalgia pain on September 13, 2010. (Tr. 273). Plaintiff was achy all over and reported exercising occasionally. (Tr. 273). Plaintiff reported trying Tylenol, Motrin, Tramadol, and "maybe Vicodin" to no avail. (Tr. 273). However, cold compresses on her knees and ankles provided temporary relief. (Tr. 273). Dr. Lowenthal wanted to prescribe Lyrica but Plaintiff was concerned about the side effects so he prescribed Flexeril and Neutrotin. (Tr. 273).

On September 23, 2010, Plaintiff saw Julia Bruner, M.D., for a follow-up on her diffuse muscle pain, particularly in her upper hips, shoulders, and hands. (Tr. 271-72). Plaintiff did not have any stiffness or joint swelling associated with her pain. (Tr. 271). However, Plaintiff said the pain impacted her energy level and ability to keep working. (Tr. 271). Plaintiff said she had not tried Neutrotin as prescribed because she was concerned about taking too much medication. (Tr. 271). Plaintiff tried walking and experienced increased pain rather than improvement. (Tr. 271). Plaintiff was not stretching when she exercised. (Tr. 271). Dr. Bruner encouraged Plaintiff to make lifestyle changes to aide her symptoms, prescribed a trial of Amitryptiline and recommended Plaintiff be evaluated with behavioral health. (Tr. 272).

On February 17, 2011, Plaintiff saw Amy M. Zack, M.D., at MetroHealth complaining of pain in her neck and back, muscle cramps in her calves at night, and sore legs in the morning. (Tr. 389). Plaintiff reported she had been unable to take Lyrica because of the side effects. (Tr. 389). At Plaintiff's request, Dr. Zack tested for Lyme disease because of Plaintiff's recent travel to North Carolina. (Tr. 389). On examination, Plaintiff had no edema, but had spasms in her neck and mid-back and an abnormal gait. (Tr. 389). Dr. Zack ordered blood tests, prescribed vitamins, Lyme Disease antibodies, and Zantac for gastroesophageal reflux disease (GERD), and referred Plaintiff to an arthritis clinic for fibromyalgia. (Tr. 390).

Plaintiff went to the emergency room on March 4, 2011 complaining of right foot pain and swelling that radiated up her leg for three days. (Tr. 375). On examination, Plaintiff's right lower extremity showed no deformity, erythema, ecchymosis, or edema. (Tr. 377). Plaintiff's right foot was neurovascularly intact with normal pulses and sensation, but she was tender to palpation in her posterior calf and ankle/foot and there was mild swelling from her right knee to her toes. (Tr. 377). Plaintiff was diagnosed with peripheral edema of the right lower extremity and was advised to elevate and rest her foot and take pain relievers. (Tr. 377).

On April 14, 2011, Plaintiff saw Dr. Zack complaining of pain in all of her toes, muscles, and joints and swelling in her feet. (Tr. 369). On examination, Plaintiff had mild, non-pitting edema over the dorsum of her bilateral feet. (Tr. 370). Dr. Zack ordered an arthritis service request and x-rays of both feet. (Tr. 370). Plaintiff had x-rays taken on April 25, 2011, which were normal. (Tr. 395-97).

Plaintiff saw Dr. Khan on May 13, 2011, for diffuse aches and pains with muscle cramps. (Tr. 359). On examination, Plaintiff had a full range of motion in all joints but had multiple tender points typical of fibromyalgia. (Tr. 361). Plaintiff had no sensory deficit or muscle weakness. (Tr. 361). Dr. Khan diagnosed vitamin D deficiency and advised Plaintiff to take vitamins. (Tr. 362). Dr. Khan recommended aerobic exercise to address Plaintiff's fibromyalgia pain. (Tr. 362).

Plaintiff's Mental Impairments

In 2003 Plaintiff was admitted to University Hospitals of Cleveland after she was brought in by EMS for abdominal pain and said she took two Wellbutrin because she was feeling depressed.1 (Tr. 490). Plaintiff was diagnosed with major depressive disorder and hospital records noted Plaintiff had seen a therapist who diagnosed bipolar disorder. (Tr. 486-91). Plaintiff returned to University Hospitals in June 2004 with suicidal thoughts and concern she may harm herself.

-4-

(Tr. 484-85).

Plaintiff's next mental-health centered visit occurred on October 20, 2010 when Plaintiff saw Howard Hernandez, M.D., for a mental health assessment. (Tr. 265). Plaintiff's chief complaint was depression. (Tr. 365). She reported experiencing loss of interest, low concentration, irritability, trouble sleeping, racing thoughts, hypersexuality, and going on shopping sprees to the point of having to cut her line of credit. (Tr. 266). Plaintiff also reported visualizing hitting her ex-husband due to anger over things he had done in the past. (Tr. 266). Plaintiff admitted to daily THC use. (Tr. 266). Plaintiff gave a history of depression, postpartum depression, bipolar disorder, Post-Traumatic Stress Disorder ("PTSD"), and fibromyalgia. (Tr. 265). Plaintiff also reported a history of childhood molestation by two cousins and her brother's father whom Plaintiff suspects may have murdered her mother. (Tr. 268). On examination, Plaintiff was well-groomed, cooperative and oriented to time, person, and place. (Tr. 268).

Plaintiff's speech was clear, her thought process was logical with tight associations, and she had fair judgment and insight. (Tr. 268). Plaintiff had good recent and remote memory recall and her attention and concentration were sustained. (Tr. 268). Plaintiff's mood was depressed and irritable. (Tr. 268). Plaintiff denied auditory hallucinations, visual hallucinations, or suicidal or homicidal thoughts or intentions. (Tr. 268). Dr. Hernandez diagnosed unspecified mood disorder and prescribed Cymbalta and Tradazone for sleep, continued Plaintiff on Elavil, and recommended continued counseling. (Tr. 269).

Plaintiff saw Dr. Hernandez two more times for pharmacological management on November 16, 2010 and December 14, 2010. (Tr. 257, 262). Her mental status examinations remained largely unchanged from her first appointment. (Tr. 257-58, 262-64). She continued to report problems with irritability, anxiety, feeling hyper, and pain management. (Tr. 257-58, 262-63).

Plaintiff saw Smitha Battula, M.D., for pharmacological management on February 23, 2011. (Tr. 385). Plaintiff felt worse in terms of bodily pain and her mood was irritable. (Tr. 385). Plaintiff said she had racing thoughts and went a week without sleeping. (Tr. 385). Plaintiff said she had spending and cleaning sprees, experienced panic attacks, and felt paranoid with no delusions. (Tr. 385). On examination, Plaintiff was adequately groomed but appeared sad and down. (Tr. 386). Plaintiff was cooperative, oriented to time, place, and person, and displayed spontaneous speech with normal rate and flow. Her thought process was logical, her recent and remote memory were within normal limits, and she had fair judgment and insight. (Tr. 386). Plaintiff's mood was irritable, her affect constricted, and her attention and concentration distracted. (Tr. 386). Dr. Battula diagnosed bipolar disorder, panic disorder with agoraphobia, and PTSD. (Tr. 386). Dr. Battula prescribed Pristiq, Depakote, and Klonopin. (Tr. 386).

Plaintiff returned to Dr. Battula for pharmacological management on May 12, 2011. (Tr. 354). Plaintiff said her mood was irritable and "snappy." (Tr. 354). Plaintiff reported having a poor appetite and trouble sleeping due to racing thoughts and nightmares. (Tr. 354). She had a recent hypomanic episode where she was unable to sleep for three days with high energy and racing thoughts. (Tr. 354). Plaintiff reported hearing voices, whispers, and a baby crying two or three times per week. (Tr. 354). Plaintiff also reported seeing shadows occasionally. (Tr. 355). Plaintiff felt paranoid and experienced panic attacks, fear of going into crowded spaces, and flashbacks of her childhood sexual abuse. (Tr. 254-55). On examination, Plaintiff appeared adequately groomed but hypomanic and irritable. (Tr. 355). Plaintiff's behavior was cooperative, her thought process was logical with no evidence of paranoia, and she was oriented to time, place, and person. (Tr. 355). Plaintiff's speech was rapid but interruptible and her attention and concentration were distracted. (Tr. 355). Plaintiff's recent and remote memory were normal and her judgment and insight were fair. (Tr. 355). Dr. Battula diagnosed THC abuse/dependence in addition to her prior diagnoses. (Tr. 355). Dr. Battula continued Plaintiff on Pristiq, Klonopin, and Trazodone, discontinued Depakote (because it was stopped by the patient), and started Seroquel XR. (Tr. 356).

Plaintiff saw Rebecca Snider-Fuller, P.C.N.S., for pharmacological management on October 12, 2011. (Tr. 464). Plaintiff reported increased fibromyalgia pain due to rainy weather. (Tr. 464). Plaintiff said she did stretches but was careful not to over-do it. (Tr. 464). Plaintiff reported not drinking since her last visit and that she was cutting back on her marijuana use. (Tr. 464). Nurse Snider-Fuller concluded Plaintiff was stable, prescribed Abilify, and discontinued Seroquel. (Tr. 465).

On October 20, 2011, Plaintiff saw Kristen L. Liviskie, L.L.S.W., for a behavioral health counseling appointment. (Tr. 460). Plaintiff said she worried about her eight-year-old daughter being molested and reported feeling guilt over her own molestation. (Tr. 460-61). Plaintiff identified her husband as the source of her frustration, specifically stating she was bothered by her husband's relationship with her daughter which she felt was more like a brother and sister than a father and child. (Tr. 461). Plaintiff reported they had been separated for three years but their communication had improved. (Tr. 461). Plaintiff's mental status examination was largely unremarkable. (Tr. 461).

On November 23, 2011, Plaintiff saw Nurse Snider-Fuller and reported being exhausted and stressed. (Tr. 457). Plaintiff described marital problems as well as problems with her cousin. (Tr. 457). Plaintiff indicated she was snappy, irritable, and had one-to-two panic attacks per day but her flashbacks were not as bad. (Tr. 457). On examination, Plaintiff was cooperative but agitated and anxious. (Tr. 457). Plaintiff's speech remained normal and spontaneous, she was oriented, and her judgment and insight were fair. (Tr. 457). She had a logical

thought process but suffered from racing, paranoid thoughts. (Tr. 457). Plaintiff continued to suffer from auditory and visual hallucinations as well as worsening memory. (Tr. 457). Nurse Snider-Fuller restarted Abilify, continued Klonopin, encouraged Plaintiff to remain sober, and questioned her compliance with medications. (Tr. 458).

Plaintiff saw Ms. Liviskie two more times for individualized counseling on November 28 and December 13, 2011 and saw Nurse Snider-Fuller one more time for pharmacological management on December 28, 2011. (Tr. 446, 450, 453). During these appointments, Plaintiff continued to describe marriage-related stress exacerbated by the PTSD her husband developed while serving in Iraq. (Tr. 446, 450). On examination, Plaintiff was repeatedly well-groomed with good hygiene, cooperative, oriented to time, place, and person, had good insight, judgment, and organized thoughts, and displayed spontaneous speech with normal rate and flow. (Tr. 446, 450). Plaintiff's mood was consistently anxious and irritable. (Tr. 446, 451). On December 11, Ms. Liviskie noted Plaintiff's concentration was sustained, but on December 28, Nurse Snider-Fuller found Plaintiff's attention and concentration was poor. (Tr. 446, 450).

In a letter dated January 23, 2012 Ms. Liviskie and Nurse Snider-Fuller, reported Plaintiff had been receiving medication management services from Nurse Snider-Fuller since August 1, 2011 and behavioral health counseling from Ms. Liviskie since September 6, 2011 for bipolar disorder and posttraumatic stress disorder. (Tr. 423). This letter was meant to supplement medical records not admitted to evidence until after the hearing on February 3, 2012. (Tr. 21, 425-468). Ms. Liviskie and Nurse Snider-Fuller noted Plaintiff had experienced several traumatic events in her life and had difficulties in her day-to-day functioning. (Tr. 423). They said it was difficult for Plaintiff to be around people due to anxiety and described Plaintiff's symptoms as alternating between depression and hypomania. (Tr. 423). Although Plaintiff was working towards stabilizing her symptoms, they were exacerbated by her fibromyalgia. (Tr. 423).

On June 3, 2013, Plaintiff was seen at St. Vincent's emergency room complaining of depression and suicidal and homicidal ideation. (Tr. 500). On examination, Plaintiff appeared well and alert and her mood was normal although on psychological assessment, some anger was detected. (Tr. 500-501, 503). The treating physician assessed Plaintiff as a low suicide risk. (Tr. 505). Plaintiff was diagnosed with generalized anxiety disorder and PTSD and assessed a global assessment of function ("GAF") score of 60.2 (Tr. 506). At discharge, the treating physician made arrangements for crisis stabilization and prescribed Trazodone, Klonopin, and Risperdol. (Tr. 506-508).

Psychological Questionnaire

On June 23, 2011, Dr. Battula completed a psychological questionnaire. (Tr. 402-403). Dr. Battula stated Plaintiff was initially examined at MetroHealth

-7-

on October 20, 2010 and had been seen every one-to-two months since for bipolar disorder. (Tr. 402). Dr. Battula diagnosed bipolar disorder, panic disorder with agoraphobia, PTSD, and marijuana abuse. (Tr. 402). He stated that Plaintiff's symptoms when depressed included depression, irritable mood, poor appetite, low energy, anhedonia, and poor sleep; and stated that her symptoms when hypomanic included racing thoughts, not sleeping for days, spending and cleaning sprees, auditory hallucinations, and recurrent nightmares. (Tr. 402). When asked about Plaintiff's ability to sustain an eight-hour work day, five days a week, Dr. Battula said Plaintiff would have difficulty with attention and concentration that interferes with her daily functioning. (Tr. 402). Dr. Battula said Plaintiff's bipolar disorder caused her to be irritable and snappy and that Plaintiff had panic attacks in crowded places that would affect her ability to get along with co-workers, supervisors, and the general public. (Tr. 403). Dr. Battula said Plaintiff would have difficulty in public places and difficulty concentrating that would affect her ability to respond to work pressures including decision making, attendance, and maintaining a schedule. (Tr. 403). When asked for additional comments on Plaintiff's capabilities for working in a competitive work environment on a regular, sustained basis, Dr. Battula said Plaintiff had poor sleep due to bipolar disorder, PTSD caused auditory hallucinations, and Plaintiff had difficulty with organization and concentration. (Tr. 403).

Consultative Examinations

On February 18, 2011, David House, Ph.D., conducted a consultative psychological evaluation of Plaintiff. (Tr. 337). Plaintiff's grooming and hygiene appeared adequate, she ambulated with especial difficulty, and her mood was blunted. (Tr. 339). Plaintiff's speech was understandable without poverty of content, loose associations, or tangential speech and her eye contact was fair. (Tr. 339). Plaintiff elicited no delusional material during the interview, did not present as paranoid or grandiose, and denied any auditory or visual hallucinations. (Tr. 340). On examination, Plaintiff was oriented to place, person, and partially to time. (Tr. 340). Plaintiff's memory for digits and computational skills were borderline but her knowledge of current events was fair. (Tr. 341). Plaintiff's insight and judgment were markedly limited and Dr. House opined that Plaintiff would need supervision in management of her finances and daily affairs. (Tr. 341).
Dr. House diagnosed panic disorder without agoraphobia, bereavement, and cannabis abuse. (Tr. 341). He opined that Plaintiff's anxiety caused her to be markedly limited in her ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks. (Tr. 341). Plaintiff's ability to understand, remember, and follow directions was no worse than mildly limited, her level of adaptability was moderately limited, as was her ability to relate to others and the general public. (Tr. 341-42). Dr. House opined that Plaintiff's ability to withstand the stress and pressure of day-to-day work was markedly limited, primarily due to anxiety. (Tr. 341). Dr. House assigned a GAF score of 43 based on Plaintiff's panic attacks and opined that functionally,

Plaintiff appeared to demonstrate serious impairment in employability. (Tr. 342).

On March 15, 2011, Mehdi Saghafi, M.D., conducted a consultative physical evaluation of Plaintiff. (Tr. 343, 346). On examination, Plaintiff's back revealed no gross deformity and no muscle spasms. (Tr. 345). Plaintiff's straight leg raise testing revealed some limitation due to pain in her hips and the back of her legs. (Tr. 345). Based on her history and objective physical findings, Dr. Saghafi found Plaintiff could stand and walk for four-to-five hours a day, did not need ambulatory aid, and could lift and carry five pounds frequently and fifteen pounds occasionally. (Tr. 346). Plaintiff could push and pull objects, operate hand and foot controlled devises, and was able to drive a vehicle despite not having a license due to her medical issues.  (Tr. 346). Plaintiff's speech, hearing, memory, orientation, and attention were within normal limits. (Tr. 346).

Medical Expert Testimony

At the request of the ALJ, ME Daniel Schweid, M.D., testified at the hearing. (Tr. 45).  Dr. Schweid testified that Plaintiff had bipolar disorder, panic disorder with some agoraphobia, PTSD, fibromyalgia, and cannabis abuse. (Tr. 53-54). Dr. Schweid testified that Plaintiff was moderately impaired in her abilities to complete activities of daily living and maintain social functioning, concentration, persistence, and pace. (Tr. 55). Dr. Schweid testified that, in his opinion, Plaintiff's impairments did not meet or equal a listed impairment. (Tr. 55-56).

With regard to Plaintiff's residual functional capacity ("RFC"), Dr. Schweid said he would limit Plaintiff to a range of light work. (Tr. 56). Due to marijuana use and fibromyalgia, Plaintiff should not be around unprotected heights, dangerous machinery, or drive a motor vehicle. (Tr. 56). Plaintiff was limited to simple, repetitive tasks that did not have high or strict production quotas or involve intense interpersonal aspects such as arbitration, negotiation, confrontation, being a supervisor or manager or otherwise being responsible for other people.  (Tr. 56-57). Dr. Schweid said Plaintiff's substance abuse made the question of sustainability "very tough". Dr. Schweid opined that Plaintiff could not sustain substantial gainful activity. (Tr. 57). After a lengthy discussion regarding Plaintiff's marijuana use, Dr. Schweid testified that he could only say that he would advise people clinically to stop using and that he could not say for certain marijuana's impact on Plaintiff's symptoms. (Tr. 59-60). However, Dr. Schweid opined that even if Plaintiff stopped using marijuana, she would still be absent from work three-to-four times a month due to fibromyalgia and mood problems. (Tr. 61).

VE Testimony

Mark Anderson, VE also testified at the hearing. (Tr. 66). The ALJ asked the VE about a hypothetical person with Plaintiff's vocational background who was limited to sedentary or light work; could not climb ladders, ropes, or scaffolds; was limited to routine, low stress tasks with no assembly line work, no high or strict production quotas, or piece rate work; and required work that didn't involve negotiation, confrontation, or other intense interpersonal interaction with coworkers, supervisors, or the general public or managing or being responsible for other people.  (Tr. 71). The VE responded that such an individual would be unable to perform Plaintiff's past relevant work. (Tr. 71). He said such a person could perform jobs available in the national economy including inspector and hand packager, housekeeper, and mail clerk. (Tr. 72). The ALJ then asked about a second hypothetical individual, who had all of the restrictions of the person in the first hypothetical but who also could not work in proximity to unprotected heights, dangerous moving machinery, or other workplace hazards, or operate a motor vehicle as part of the job. (Tr. 73). The VE responded that such a person would still be able to perform those three jobs. (Tr. 73). The ALJ then asked about a hypothetical person with Plaintiff's vocational background who was limited to sedentary work. (Tr. 73). The VE identified document preparer, patcher, and touch-up screener as jobs such a person could perform. (Tr. 74). The ALJ then added the restrictions of not being able to work in proximity to unprotected heights, dangerous moving machinery, or other workplace hazards, or operate a motor vehicle as part of the job. (Tr. 75).  The VE responded that Plaintiff could still perform those three jobs. (Tr. 75). The ALJ then asked whether the answers to any of these hypotheticals would change if the individual were absent, on average, one day per week. (Tr. 75). The VE responded that there were not a significant number of jobs in the national economy that would tolerate one absence per week. (Tr. 75-76).

*ALJ's Decision*

On May 25, 2012, the ALJ found Plaintiff had the severe impairments of fibromyalgia, bipolar disorder, panic disorder with some agoraphobia, PTSD, and marijuana abuse. (Tr. 15).  The ALJ found Plaintiff's impairments considered singly and in combination did not meet or equal a listing. (Tr. 16). The ALJ found Plaintiff had a moderate restriction in activities of daily living based on a function report completed by Plaintiff. (Tr. 17). The ALJ found Plaintiff had moderate difficulties in terms of social functioning based on Plaintiff's account of her social activities in the report and to doctors. (Tr. 17). Further, the ALJ found Plaintiff had moderate difficulties with regard to concentration, persistence, or pace. (Tr. 17). In making this finding, the ALJ disagreed with Dr. House, who found Plaintiff to be markedly impaired in this area, noting that Dr. House's opinion was an overestimate of the severity of Plaintiff's restrictions, and was based only on a snapshot of her functioning and that he agreed with the state agency consultant who noted Plaintiff was functional on a daily basis. (Tr. 17).

> Next, the ALJ found Plaintiff had the RFC to do work at the sedentary level. (Tr. 18). Additionally, Plaintiff could not climb ladders, ropes, or scaffolds; could not work in proximity to unprotected heights, dangerous machinery, or other workplace hazards; could not operate a motor vehicle; and could do only routine, low stress tasks with no high or fixed production quotas, assembly line work, or work involving intense interpersonal interactions with the public, co-workers, or supervisors. (Tr. 18). Further, Plaintiff could not manage or supervise others and
> could not be responsible for their health, safety, or welfare. (Tr. 18). Based on Plaintiff's age, education, work experience, RFC, and VE and ME testimony the ALJ found Plaintiff could work as document preparer, patcher, or touch-up screener. (Tr. 23). Thus, the ALJ found Plaintiff was not disabled. (Tr. 23-24).

Report and Recommendation at pp. 2-16. (Footnotes omitted).

## Report and Recommendation

Plaintiff filed her Complaint with this Court on October 11, 2013, challenging the final decision of the Commissioner. (Docket #1.) On December 3, 2014, the Magistrate Judge issued his Report and Recommendation. (Docket #16.) The Magistrate Judge determined that the Commissioner applied the correct legal standards and found the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income to be supported by substantial evidence. On December 15, 2014, Plaintiff filed Objections to the Report and Recommendation. (Docket #17.) On March 5, 2013, the Commissioner filed a Response to Plaintiff's Objections. (Docket #18.)

## Standard of Review for a Magistrate Judge's Report and Recommendation

The applicable district court standard of review for a magistrate judge's report and recommendation depends upon whether objections were made to the report. When objections are made to a report and recommendation of a magistrate judge, the district court reviews the case *de novo*. FED. R. CIV. P. 72(b) provides:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

The standard of review for a magistrate judge's report and recommendation is distinct from the standard of review for the Commissioner of Social Security's decision regarding benefits.  Judicial review of the Commissioner's decision, as reflected in the decisions of the ALJ, is limited to whether the decision is supported by substantial evidence.  *See Smith v. Secretary of Health and Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989).  "Substantial evidence exists when a reasonable mind could accept the evidence as adequate to support the challenged conclusion, even if that evidence could support a decision the other way."  *Casey v. Secretary of Health and Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) (citation omitted).

## Conclusion

This Court has reviewed the Magistrate Judge's Report and Recommendation *de novo* and has considered all of the pleadings, transcripts, and filings of the parties, as well as the objections to the Report and Recommendation filed by Plaintiff.  After careful evaluation of the record, this Court adopts the findings of fact and conclusions of law of the Magistrate Judge as its own.

Magistrate Judge Knepp thoroughly and exhaustively reviewed this case, and correctly determined that the Commissioner applied the correct legal standards and that the Commissioner's decision denying Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income was supported by substantial evidence.  Accordingly, the Report and Recommendation of Magistrate Judge Knepp (Document # 16) is hereby ADOPTED.  The Commissioner's final determination denying Plaintiff's application for Disability Insurance

Benefits and Supplemental Security Income is hereby AFFIRMED.

This case is hereby TERMINATED.

IT IS SO ORDERED.

                                               s/Donald C. Nugent
                                               DONALD C. NUGENT
                                               United States District Judge

DATED: January 9, 2015